UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

TEENA R. MAGEE                                          PLAINTIFF

VS.                              CIVIL ACTION NO. 3:15CV333TSL-RHW

SECURITAS SECURITY SERVICES USA, INC.
AND TRUSTMARK CORPORATION                              DEFENDANTS


MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendant Trustmark Corporation for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and a related motion by Trustmark to strike the affidavit of plaintiff Teena R. Magee which Magee submitted in support of her response to Trustmark's summary judgment motion.  The court, having considered the motions and responses thereto, together with pertinent attachments, concludes that both motions should be granted.

Magee's Complaint

Plaintiff Tina Magee was formerly employed by Securitas Security Services USA, Inc. (Securitas) as a security guard, and for the period of time from February 3, 2014 to August 4, 2014 was assigned by Securitas to the Trustmark Day Center in Pearl, Mississippi.  Magee alleges that during her assignment to the Day Center, she was subjected to offensive and pervasive racial and sexual harassment from Trustmark employees.  According to the complaint, Magee complained to her supervisor at Securitas on several occasions but no corrective action was ever taken.

Eventually, on August 4, 2014, Magee's supervisor informed her
that Trustmark did not want her working at the Day Center any
longer.  Magee was offered assignment to another position, but
declined, since the position offered was for fewer hours and lower
pay, and was otherwise undesirable.  Accordingly, Magee was
terminated from her employment.  Following her termination, Magee
promptly filed EEOC charges of race and sex discrimination against
Securitas and Trustmark.  After the EEOC issued notices of right
to sue, Magee filed the present action against Securitas and
Trustmark alleging claims of race and sex discrimination pursuant
to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*,
and race discrimination under 42 U.S.C. § 1981.

Trustmark has moved for summary judgment as to Magee's claims
against it, contending, in the alternative, that (1) it cannot be
liable under either Title VII or § 1981 since it was not Magee's
employer; (2) Magee cannot demonstrate that she was subjected to
any severe or pervasive harassment based on race or unwelcome
sexual harassment; and/or (3) she did not report any alleged
harassment to Trustmark and there is otherwise no evidence that
Trustmark knew or should have known about any alleged harassment
and failed to take prompt remedial action.

Title VII:

In her response to the motion, Magee concedes that Trustmark
was not, in fact, her employer and that Trustmark therefore cannot

2

be liable under Title VII.  See Turner v. Baylor Richardson Med.
Ctr., 476 F.3d 337, 343 (5th Cir. 2007) ("[G]enerally only
employers may be liable under Title VII."); Canon v. Bd. of
Trustees of State Institutions of Higher Learning of Mississippi,
133 F. Supp. 3d 865, 869 (S.D. Miss. 2015) ("[T]o establish Title
VII liability on the part of a particular defendant, the plaintiff
must prove both that the defendant meets Title VII's definition of
"employer," i.e., "a person engaged in an industry affecting
commerce who has fifteen or more employees ..., and any agent of
such a person...., and that an employment relationship existed
between him and that defendant.") (citations and internal
quotation marks omitted).  Thus, Trustmark is entitled to summary
judgment on Magee's claim for gender discrimination and her claim
for race discrimination under Title VII.[1]

Section 1981:

Non-Employer Liability

Magee contends that even though Trustmark was not her
employer, she can still make out a claim against it for race
discrimination under § 1981 since liability under § 1981 is not
limited to statutory "employers."  Section 1981 provides that
"[a]ll persons within the jurisdiction of the United States shall

---

[1]     Whereas Title VII prohibits gender discrimination in
addition to other forms of discrimination, § 1981 prohibits only
racial discrimination.  Thus, plaintiff cannot proceed against
Trustmark for gender discrimination under Title VII or  § 1981.

have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Unlike Title VII, § 1981 does not limit claims to statutory "employers," and in the employment context, the Fifth Circuit has recognized that in some circumstances, a right of recovery against non-employer defendants exists, as, for example, where an individual employee was "essentially the same as the [employer] for the purposes of the complained-of conduct." McIntyre v. Roly's Trucking, Inc., No. 4:14-CV-193-A, 2014 WL 1692782, at *2 (N.D. Tex. Apr. 29, 2014) (quoting Foley v. Univ. of Houston Sys., 355 F.3d 333, 337-38 (5th Cir. 2003)). While the Fifth Circuit "has declined to define comprehensively the universe of [non-employer defendants] who can be held liable under § 1981," Black Farmers and Agriculturists Ass'n, Inc. v. Hood, No. 3:13CV763TSL-JMR, 2014 WL 935147, at *7 (S.D. Miss. Mar. 10, 2014) (citation omitted), the potential for such liability likely exists "only for a defendant who was in some form of employment relationship with the plaintiff ... as employer, coworker, or supervisor," McIntyre, 2-14 WL 1692782, at *2 (citing Bellows v. Amoco Oil Co., 118 F.3d 268, 274 (5th Cir. 1997), and James v. Parish, 421 F. App'x 469, 470 (5th Cir. 2011)). Moreover, in all events, the defendant at issue must have had control or managerial authority over the plaintiff. Williams-Boldware v. Denton Cty., No. 4:09-CV-591, 2010 WL 2991164, at *8 (E.D. Tex. June 15, 2010),

4

report and recommendation adopted, No. 4:09CV591, 2010 WL 2991167 (E.D. Tex. July 27, 2010) ("[A] supervisor or coworker is 'essentially the same' as an employer if they exercise control or 'managerial authority' over the plaintiff."); see also Howard v. Miss. State Univ., No. 1:13-CV-00154-MPM, 2015 WL 1862923, at *4 (N.D. Miss. Apr. 23, 2015) ("To be considered "essentially the same" as the State, the employee must exercise control over the plaintiff's position.").

In the case at bar, Trustmark did not move for summary judgment on plaintiff's § 1981 claim on the basis that it was not "essentially the same" as Magee's employer. Rather, it contended it was entitled to summary judgment on the claim because it was not her "employer." However, Trustmark argued at length and presented ample evidence demonstrating that it had no control or managerial authority over Magee's employment while she was assigned to the Day Center. The evidence shows, for example, that Trustmark was not involved in the initial decision to assign Magee to the Day Center; and although it did ultimately request that Securitas assign someone other than Magee to fulfill Securitas's obligations under its contract with Trustmark, it was Securitas that ultimately made the decision to remove her from the Day Center. Further, Trustmark had no involvement in the decision to terminate Magee's employment with Securitas; rather, that was a decision made solely by Securitas. Trustmark explains, moreover,

5

that while Doug Winstead, Trustmark's head of security, was
responsible for overseeing Trustmark's contract with Securitas,
Securitas was responsible for overseeing the day-to-day
performance of its officers.  The officers reported directly and
solely to their Securitas supervisor, Kim Henry.  Trustmark had no
authority to direct or change the duties assigned to Magee by
Securitas or to discipline Magee for any infractions.  Instead, if
and when Trustmark had concerns relating to the actions of any
Securitas officer, it directed those concerns to Securitas, not to
the individual officer.  In short, Trustmark's evidence
establishes that it had no control or managerial authority over
Magee.

In her response to Trustmark's motion, Magee does not address
the issue of Trustmark's control or authority – or lack of control
or authority – over her employment.  Instead, she merely declares,
without citation to authority and without elaboration, that "it is
simply not true" that "1981 applies only to employers."  Magee
does not acknowledge the requisites for nonemployer liability
under § 1981, namely, that the nonemployer be "essentially the
same" as the employer and thus have the right of control or
managerial authority over her employment; and she has made no
attempt to refute Trustmark's evidence that, in fact, it lacked
such control or authority over her.  In the court's opinion,
therefore, in view of Trustmark's uncontroverted evidence on this

issue, Magee's § 1981 race discrimination claim against Trustmark
fails as a matter of law.  Her complaint is therefore due to be
dismissed.

The court would further observe, however, that even if there
were a triable issue as to whether Trustmark was "essentially the
same" as Securitas vis-a-vis Magee's employment so that it could
potentially be liable under § 1981, the court would still find
that summary judgment was in order since the evidence which is
properly before the court fails to disclose a genuine issue of
material fact on Magee's claim for race discrimination.

Elements

Magee's § 1981 claim is based on her allegation that she was
subjected to a racially hostile work environment.  To prevail on a
hostile work environment claim under § 1981, Magee must show that

> (1) [she] belongs to a protected group, (2) [she] was
> subjected to unwelcome harassment, (3) the harassment
> complained of was based on race, (4) the harassment
> complained of affected a term, condition, or privilege
> of [her] employment, and (5) the employer knew or should
> have known of the harassment and failed to take prompt
> remedial action.

Barkley v. Singing River Elec. Power Ass'n, 433 F. App'x 254, 257
(5th Cir. 2011).  To be actionable, the harassment must involve
"racially discriminatory intimidation, ridicule, and insults" that
are "sufficiently severe or pervasive that they ... alter the
conditions of employment and ... create an abusive working
environment."  Harris-Childs v. Medco Health Sols., Inc., 169 F.

7

App'x 913, 917 (5th Cir. 2006). "To ensure that [§ 1981] does not become a 'general civility code,' only 'extreme' conduct will be found sufficiently severe or pervasive: 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" Henry v. CorpCar Servs. Houston, Ltd., 625 F. App'x 607, 611 (5th Cir.), reh'q denied (Mar. 5, 2015), cert. denied, 136 S. Ct. 104, 193 L. Ed. 2d 36 (2015) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). "To determine whether a working environment is hostile or abusive, all circumstances must be considered, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Harris-Childs, 169 F. App'x at 917 (quoting Harris, 510 U.S. at 23, 114 S. Ct. 367). Further, "the conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." Stewart v. Miss. Transp. Comm'n, 586 F.3d 321, 330 (5th Cir. 2009).

Trustmark argued in its motion that Magee cannot prevail on a claim of race discrimination since she cannot establish that she was subjected to racial harassment that was severe or pervasive,

and in any event cannot prove that Trustmark was aware of any alleged racial harassment.  In response to the motion, Magee submitted her affidavit in which she relates facts that she contends create genuine issues of material fact on both of these issues.  In her affifdavit, she asserts that every day she worked at the Trustmark Day Center, she was subjected to racially hostile remarks by Trustmark employees, some of which comments did not mention race but which she contends "inferred the comments were based on race."  On this issue, she states:

> For example, there would be comments like "I don't see why they wear their hair like that."  This comment was in reference to why black females wear a certain hair style.

> Another example is when a Day Center employee stated, "I hate her hair.  I don't see why they wear their hair like that.  Don't they realize that's ugly."  This comment was also in reference to why black females wear a certain hair style.

> One example of a direct reference to my race was when a Day Center employee stated, "Just look at her skin color.  I bet she thinks she is white, but she is not.  Black people are just nasty."  I do not remember the name of the employee that made this statement, but she was a white female under Billy Henderson's supervision.

> When I was working at the Day Center, a white female employee of Trustmark from Tennessee came to the Day Center.  She leaned into another white female at my counter and stated, "Do you smell her?  She smells clean.  You usually don't find them that smell clean like that."  While my race was not specifically mentioned it was clear she was referencing my race as blacks have a negative stereotype of being dirty.

Magee also claims in her affidavit that she reported this alleged
harassment to Trustmark, stating:

> I did complain to Billy Henderson, who was a Vice
> President for Trustmark, and Doug Winstead, who was a
> Vice President for Trustmark, about the racial
> harassment that I was being subjected to by their
> employees.
> Mr. Henderson said he would talk to Mr. Winstead to see
> if it could be investigate. [sic].
> I complained to Mr. Winstead in March 2014, and May 2014
> about the racial harassment.
> Mr. Winstead would respond that he would investigate the
> situation.  He never told me what happened in his
> investigation, but the racial harassment never stopped.

Trustmark's Motion to Strike

Trustmark has moved to strike portions of Magee's affidavit
on the basis that it directly contradicts her prior deposition
testimony on a number of material matters.  Specifically, in her
deposition, plaintiff was asked repeatedly to describe statements
or incidents that she felt constituted racial harassment/
discrimination, and the *only* comments she identified related to
her hair.  When asked at the start of her deposition, "Why do you
believe you were discriminated against because of your race?",
Magee responded, "Because of statements that one of the managers
would often say concerning my hair."  She went on to explain that
every time she would wear her hair in a certain style, Suzanne
Kenny, a Trustmark manager, would stand nearby and comment on it,
saying something like, "[T]here she goes wearing her hair like
that again.  Now, I'm going to have to deal with people coming in

and telling me all about her big ugly hair," or "I don't see why they wear their hair like that."  Magee related during her deposition that on another occasion, she and Kenny were talking about hair dye and Kenny remarked that she did not understand why some people with gray hair will not dye their hair.  Magee responded that perhaps some people "are just really proud of their gray," and further informed Kenny that "Black hair is a little bit different anyway."  When asked, "[A]re there any other comments that you felt were racially motivated?", Magee responded, "No ma'am.  Those were just the regular comments that I heard."

Later in her deposition, Magee was asked, "So tell me the problems that you had with Trustmark employees."  She responded:

> Like I said, they would come through the foyer and they would tell us they don't understand why that they have security, they've never had security before.  They've been working here X amount of years, and that they've never had security before, and they didn't feel that they needed us there now.  Just being insulted from the start.
> ...
> Well, then later, a little bit later on is when I started having the issues again about my hair.  You know, there was a young lady – I want to think that her first name is Tracy.  I never wrote her name down, because this was still in the breathing process when we were just trying to get the new out of the way and let everybody know that we're not there to hurt them, and so I never did write her name down. ...  And she was actually the one who got everything started about my hair.  She would come in, and she would just stand right there in the foyer like I couldn't hear her, and say, "I hate her hair.  I don't see why they wear their hair like that.  Don't they realize that's ugly."  And I was just – you know, just sitting right there, and I never said anything to her about that.

11

Magee also related that a Judy Green

> would say derogatory things about my hair, also, and I
> wear wigs a lot.  So when I started back wearing my wigs
> that was just not good enough for her either. ... She
> would say, "I don't know if that's a wig or not, but
> that's an ugly haircut, and I don't see what she's
> wearing that for.  It's no better than her real hair."
> And she would just stand right in the foyer and discuss
> me as if I was not there.

When asked if there were "any other comments that you felt were

racially derogatory," she said, "[T]hose were the everyday ones."

She agreed that the comments she perceived as racial harassment

were comments about her hair, not about her race or skin color,

but "[m]ainly comments about the texture of my hair and how I wore

it."  Later, near the end of her deposition, she was again asked,

"Now, is there any other incidences or behavior of a Trustmark

employee or a Securitas employee that you believe is

discriminatory or harassing that we have not talked about today?",

to which she responded, "[N]ot that I can remember. ... So I'm

just going to have to say to the best of my memory, no."

In addition, when asked in her deposition whether she

reported these comments or complained to anyone about the

comments, she testified that she reported them to her supervisor

at Securitas, Kim Henry.[2]  When she was specifically asked, "And

---

[2]     Magee explained that in early April 2014, immediately
after the harassment started, she called Henry and "told her the
things that were going on at the Day Center."  Henry responded
that she would have a talk with Doug Winstead, Trustmark's head of
security, to see what he could do about it.  Magee testified she

12

you never reported any of ... the ladies' comments to anyone at Trustmark.  Isn't that correct?", Magee responded, "That's correct."

The Fifth Circuit has recognized that the utility of summary judgment as a procedure for screening out sham issues of fact would be greatly diminished if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony. Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000) (citing Perma Research and Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).  Accordingly, the court has held that "a nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony."  Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 228 (5th Cir. 1984).  See also Doe ex rel. Doe, 220 F.3d at 386 (explaining that "a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment.").  Trustmark submits that Magee's affidavit is

---

did not hear back from Henry about her complaint and the harassment did not stop, so she went back to Henry.  Henry merely told her to document the incidents.  Magee admitted she knew that Securitas had a hotline and a website where employees could make reports of harassment or discrimination if they felt their allegations were not being adequately handled at the local level, but she did not use those means of reporting because she was "trying to give Ms. Henry a chance to handle it since she was my direct supervisor."

nothing more than an attempt to manufacture disputed issues of fact to avoid summary judgment and hence should be stricken.

In response, Magee acknowledges that her affidavit contradicts portions of her deposition. She claims, however, that she was never given the opportunity to review and make changes to her deposition transcript, as was her right under Rule 30(e) of the Federal Rules of Procedure, and she suggests that any contradictions in her affidavit merely reflect the changes she would have made to her deposition had she been given the chance to review and make changes to her testimony.

Rule 30(e) of the Federal Rules of Civil Procedures provides:

> If requested by the deponent ... before completion of the deposition, the deponent shall have 30 days after being notified by the [court reporter] that the transcript ... is available in which to review the transcript ... and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.

Magee asserts in her affidavit, and Trustmark does not dispute, that during her deposition, she requested the opportunity to read and sign her deposition once it was transcribed and yet she was never given that opportunity. In effect, she takes the position that her affidavit is in the nature of an errata sheet and subject to a Rule 30(e) analysis rather than a sham affidavit analysis, obviously believing the former allows for the changes she has made while the latter does not.

14

In the court's opinion, however, even under Rule 30(e), the substantive changes to Magee's testimony would not be permissible. Magee has offered no explanation for the changes to her testimony regarding the incidents of alleged racial harassment to which she claims to have been subjected.  Magee plainly and repeatedly testified in her deposition that the only incidents of racial harassment to which she was subjected consisted of comments by certain Trustmark employees relating to her hair or hair style, yet in her affidavit, she claims there were additional comments relating to how good she smelled compared to how "they" usually smell, and to her skin color, including the alleged comment that "[b]lack people are just nasty."  The Fifth Circuit requires strict adherence to the procedural requirements of Rule 30(e), one of which is the requirement that the deponent provide reasons for each change she makes to her testimony.  Crawford v. Mare Mortgage, LLC, No. CIVA 4:05CV186 LR, 2006 WL 1892072, at *1 (S.D. Miss. July 10, 2006) (citing Reed v. Hernandez, 114 Fed. Appx. 609, 611 (5th Cir. 2004) ("Rule 30(e) does not provide any exceptions to its requirements."); see Fed. R. Civ. P. 30(e) (providing that "if there are changes in form or substance" deponent must "sign a statement reciting such changes and the reasons ... for making them").  As no explanation is provided for what are clearly substantive changes to her testimony – changes which contradict her prior testimony – those changes do not

15

comport with the requirements of Rule 30(e) and they will therefore be stricken.

Once those statements are stricken, the only basis for Magee's claim of racial harassment is comments she allegedly overheard by a few Trustmark employees about her hair.  Trustmark asserts that Magee cannot make out a hostile work environment based on these comments as there is no evidence that these alleged comments were based on or even related to Magee's race and because the comments, even if they were related to her race, were not sufficiently severe or pervasive to alter her working conditions.

To be actionable, harassment must be based on race.  The remarks relating to Magee's hair – assuming they related to Magee[3] – cannot arguably be found to be racial.  There is nothing arguably racial in the alleged comment by Judy Green expressing her dislike of Magee's wigs or Suzanne Kenny's comments regarding people with gray hair or expressing her opinion that Magee's hair was ugly.  The comments were certainly rude, but they do not involve any explicit, implicit or veiled reference to Magee's race.  A closer question is presented as to the other alleged remarks which Magee claims were racially offensive, i.e., the

---

[3]     Trustmark asserts that Magee cannot establish that the comments were about her.  They were not directed to her; she merely overheard alleged comments made in her vicinity.  However, the court will assume for present purposes that the comments were about Magee.

statements by Suzanne Kenny and Tracy to the effect of "I don't know why they wear their hair like that.  Don't they realize that's ugly?".  However, courts in many cases have found that similar, and more egregious comments, were not actionable.[4]   Even

---

[4]See Venton v. Million Dollar Round Table, No. 13-CV-7725, 2015 WL 3777543, at *4 (N.D. Ill. June 16, 2015) (while comments relating to the plaintiff's hair, including: "what do black people use in their hair," "is your hair kinky," "what is the grade of your hair," and "do black people need to wash their hair every week," arguably had a racial component, but "without the traditional hallmarks of impermissible racial harassment such as slurs, epithets, or overt racial animus or intimidation do not necessarily amount to discrimination."); Stepp v. Rexnord Indus., Inc., No. 1:13-CV-00683-TWP, 2014 WL 6978329, at *7 (S.D. Ind. Dec. 9, 2014) (assuming comment, "I just couldn't get past the hair," referred to the plaintiff's dreadlocks, "this singular comment about an unidentified hairstyle does not support an inference that Rexnord discriminated against Mr. Stepp based on his race when it did not offer him employment."); Perches v. Elcom, Inc., 500 F. Supp. 2d 684, 692 (W.D. Tex. 2007) (occasional comments about the plaintiff's hair and lips, including asking whether her hair was real, though offensive utterances, were not sufficiently severe or pervasive to establish a hostile work environment); Eatman v. United Parcel Serv., 194 F. Supp. 2d 256, 264-65 (S.D.N.Y. 2002) (finding that managers' alleged comments to black employee with dreadlocks that he "looked like an alien and like Stevie Wonder," comparing his hair to "shit", equating his hair with "extracurricular" drug use, requesting a pair of scissors (as if to cut off the locks), and pulling his hair, "while hurtful, sophomoric and insulting, [were] not racist in nature and [did] not support a reasonable inference of racial discrimination" and further finding that "[l]ocked hair ... is not so closely associated with black people that a racially neutral comment denigrating it can reasonably be understood as a reflection of discriminatory animus, at least where there is no objective evidence that the speaker perceived the plaintiff's locked hair as related to his race"); but cf. Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398, 415 (5th Cir. 2015) (viewed in light most favorable to the plaintiff, defendant's comment to the plaintiff that he "know[s] how much you people spend on your ethnic hair styles" was "clearly indicative of racial animus."); Woods v. FacilitySource LLC, No. 2:13-CV-621, 2015 WL 247980, at

if the remarks could reasonably be found to constitute harassment based on race, though, they are not severe enough to support a hostile work environment claim.  See Faragher, 524 U.S. at 788, 118 S. Ct. 2275 (stating that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"); Harris, 510 U.S. at 21, 114 S. Ct. 367 (stating that the "'mere utterance of an ... epithet which engenders offensive feelings in an employee[]' does not sufficiently affect the conditions of employment to implicate Title VII") (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).

Even if Magee could show that she was subject to severe or pervasive racial harassment while assigned to the Day Center, she cannot prevail on her § 1981 claim as she has failed to show that Trustmark had notice of the alleged racial harassment.  For its part, Trustmark denies that it was ever made aware of Magee's claims of harassment.  And although Magee asserts in her affidavit that on two different occasions, she complained to two different Trustmark vice-presidents about racial harassment by Trustmark employees, her testimony in this regard directly contradicts her

---

*17 (S.D. Ohio Jan. 20, 2015), aff'd, 640 F. App'x 478 (6th Cir. 2016) (among other comments, statement that plaintiff had "nappy" hair, could be found to be based on race).

deposition testimony that she never reported any harassment to Trustmark.  Magee admits her affidavit contradicts her deposition testimony, but she opposes Trustmark's motion to strike her affidavit testimony on this issue, claiming that the court should permit the change in her testimony since the deposition was long and she "obviously misunderstood" the question.

As Judge Starrett aptly observed in Riley v. Ford Motor Co., "the rules regarding amendments to deposition testimony via Rule 30(e) are murky, at best."  No. 2:09-CV-148-KS-MTP, 2011 WL 3157204, at *4 (S.D. Miss. July 26, 2011).  The Fifth Circuit has not decided the issue, and there is a lack of consensus among circuit courts and district courts – including within the Fifth Circuit – about the scope and nature of changes permissible under Rule 30(e).  "The consensus view in this state," as noted in Riley, "appears to be that errata sheets may be used to make substantive changes to deposition testimony" if the errata sheet includes an explanation (and not merely a conclusory one) of why the change is necessary and if the opposing party is granted the benefit of certain remedial measures.  Id. (citations omitted).  However, one fact the court should consider is "whether the changes were made in response to a dispositive motion."  Id.  Indeed, courts generally tend to hold that the district court has greater discretion to strike changes to an errata sheet when such changes are made after a summary judgment motion has been filed.

See id. (stating "this Court has suggested that it would not view substantive changes to deposition testimony favorably if they were submitted after 'the filing of a motion for summary judgment or other dispositive motion.'") (quoting Walker v. George Koch Sons, Inc., No. CIV.A.2:07CV274KSMTP, 2008 WL 4371372, at *3 n.4 (S.D. Miss. Sept. 18, 2008)); see also EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268 (3d Cir. 2010) ("[W]hen reviewing a motion for summary judgment, a district court does not abuse its discretion under Rule 30(e) when it refuses to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification."); Rios v. Welch, 856 F. Supp. 1499, 1502 (D. Kan. 1994) (holding that a plaintiff is not permitted to "virtually rewrite portions of a deposition, particularly after the defendant has filed a summary judgment motion, simply by invoking the benefits of Rule 30(e)").

Magee's change in her testimony, from acknowledging that she never reported any alleged harassment to Trustmark to claiming that she did report it to Trustmark management, was made in direct response to Trustmark's summary judgment motion. Her only explanation is that she "obviously misunderstood" the question. It is hardly obvious that she misunderstood the question. There was no reason for any misunderstanding. It was not a confusing or difficult question to understand. Moreover, while Magee

repeatedly testified in her deposition about having reported the harassing conduct to her Securitas supervisor, Kim Henry, including explaining what she reported, why she reported it to Henry, and Henry's response to her reporting it (including Henry's telling her she would report it to Trustmark), Magee gave no indication whatsoever that she ever uttered a word to Trustmark about the harassment.  The court's clear impression from her testimony as a whole is that she relied on Henry to address the situation.  Under these circumstances, the court finds that Magee should not be permitted to avoid summary judgment by changing her testimony, particularly when her explanation for the change is so flimsy.[5]  Accordingly, the court will grant the motion to strike.

Magee argues that even in the absence of her testimony that she reported the harassing conduct to Trustmark, Kim Henry's affidavit, submitted by Trustmark in support of its summary judgment motion, recites that Henry conducted an investigation of Magee's allegations.  Magee concludes that as part of Henry's investigation, she would have had to contact Trustmark management to determine if there was any validity to Magee's claims.  However, Magee's speculation as to what Henry's investigation

---

[5]     The court notes, too, that in her amended complaint, Magee explicitly alleges that she "complained to her supervisor, Kim Henry, on several occasions; however, nothing was ever done to alleviate the situation."  Nowhere in the complaint does she allege or even intimate that she complained to Trustmark.

would (or should) have entailed is no substitute for proof that Trustmark was aware of Magee's allegations that she was being harassed.

For all of the foregoing reasons, the court concludes that Magee's § 1981 claim against Trustmark should be dismissed.

<u>Magee's State Law Claims</u>

In addition to her federal claims, Magee has asserted claims against Trustmark for interference with contract and for negligent and intentional infliction of emotional distress. Trustmark has moved for summary judgment as to these claims.

In response to the motion, Magee has not addressed Trustmark's contention that her claim for negligent infliction of emotional distress fails as a matter of law for lack of proof that she suffered any "sort of physical manifestation of injury or demonstrable harm". <u>Randolph v. Lambert</u>, 926 So. 2d 941, 946 (Miss. Ct. App. 2006). The court interprets from her lack of response that she has confessed this part of the motion.

"An action for tortious interference with employment ordinarily lies when a party maliciously interferes with a valid and enforceable contract, causing one party not to perform and resulting in injury to the other contracting party." <u>Davis v. AutoZone, Inc.</u>, No. 3:03-CV-740-W-S, 2011 WL 4625492, at *7 (S.D. Miss. Oct. 1, 2011). To establish a claim of tortious

22

interference, a plaintiff must establish each of the following
elements:

> 1) the acts were intentional and willful; 2) that they
> were calculated to cause damages to the plaintiffs in
> their lawful business; 3) that they were done with the
> unlawful purpose of causing damage and loss, without
> right or justifiable cause on the part of the defendant;
> and 4) that actual loss occurred.

Id. (citing Levens v. Campbell, 733 So. 2d 753, 760-61 (Miss.
1999)).  Trustmark submits that Magee's claim is without merit as
she has no evidence that Trustmark acted maliciously to cause her
damage.  Magee responds that Trustmark, in response to her
complaining of racial harassment, acted maliciously to cause her
harm by using its contract with Securitas to force her
reassignment, which in turn caused her termination.  However, not
only does the proper record evidence establish that Trustmark was
unaware of any alleged racial harassment when it requested that
Magee be reassigned, but also, there is no evidence that Trustmark
knew or had reason to know that its request that Magee be
reassigned would result, directly or indirectly, in her
termination.  Accordingly, Magee's claim for tortious interference
with contract fails.

Magee's claim for intentional infliction of emotional
distress is based on the harassment she alleges she endured while
assigned to the Trustmark Day Center.  However, the evidence of
record does not reveal such "extreme and outrageous" conduct as

23

would support a cause of action for intentional infliction of emotional distress under Mississippi law.  See Lambert v. Baptist Mem'l Hosp. N.-Mississippi, Inc., 67 So. 3d 799, 805 (Miss. Ct. App. 2011) ("Intentional infliction of emotional distress results when the actions of the defendant were wanton and willful and evoked outrage or revulsion.  The severity of the acts must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (internal quotation marks and citations omitted).  Trustmark is therefore entitled to summary judgment on this claim, as well.

<u>Conclusion</u>

Based on the foregoing, it is ordered that Trustmark's motions to strike and for summary judgment are granted.

SO ORDERED this 23rd day of August, 2016.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE

24